

FILED

Jul 06 2018, 8:52 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Kyle K. Dugger
Monroe County Public
Defender's Office
Bloomington, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Katherine A. Cornelius
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of:
Eq.W., M.W., A.W., S.W., &
Ez.W.,

V.B. (Mother),

*Appellant-Respondent,*

v.

Indiana Department of
Child Services,

*Appellee-Petitioner*

July 6, 2018

Court of Appeals Case No.
18A-JC-555

Appeal from the Monroe Circuit
Court

The Honorable Frances G. Hill,
Judge

Trial Court Cause Nos.
53C06-1711-JC-851
53C06-1711-JC-852
53C06-1711-JC-853
53C06-1711-JC-854
53C06-1711-JC-855

**Baker, Judge.**

[1] V.B. (Mother) appeals the trial court's order finding her five minor children to be children in need of services (CHINS). She argues that she was denied procedural due process and that the evidence is insufficient to support the CHINS adjudication. Although we have significant concerns about the way in which the Department of Child Services (DCS) litigated this case, we find that Mother has waived some of her arguments and that the others do not amount to due process violations. We also find the evidence sufficient. Therefore, we affirm.

## Facts

[2] In June 2017, the children were removed from Mother's care and custody and DCS filed a petition alleging that the children were CHINS. DCS alleged that Mother was under the influence of drugs while parenting the children. A factfinding hearing began on September 12, 2017, at which time DCS was unable to provide testimony regarding Mother's drug screens because of an improper request for telephonic testimony. DCS requested a continuance, which was granted. The factfinding hearing continued on October 25, 2017. DCS presented no new evidence. The trial court denied and dismissed the CHINS petition for lack of sufficient evidence on November 7, 2017.

[3]     On November 8, 2017, DCS filed a new petition alleging that the children are CHINS.[1] The new petition was based on positive drug screens, the erratic behavior of the children's father at a child and family team meeting, and the parents' struggle to pay their utility bills. The factfinding hearing took place on December 19, 2017. At this hearing, DCS presented the following evidence supporting its petition:

- Two of the children testified about sometimes being hungry, suspecting that their parents were using drugs, having a dirty and cluttered home, and their parents' lacking attempts to homeschool them.
- The children's paternal grandmother (and relative placement) testified about general concerns regarding the children's lack of consistent and structured education, the uncleanliness of the parents' home, the parents' financial struggles, and the parents' past struggles with drug use.
- With respect to the children's education, the parents do not trust public schools and have ostensibly been homeschooling the children. But the homeschooling was inconsistent and ineffective. For example, when paternal grandmother enrolled the children in public school, the nine-year-old did not know the alphabet and was unable to write his name.
- The children's maternal grandmother testified about general concerns regarding the uncleanliness of the parents' home and the parents' financial struggles.
- The Family Case Manager (FCM) testified regarding concerns about the cleanliness of the home, the parents' financial struggles, and the lack of a consistent and structured education for the children.

---

[1] Although the trial court dismissed the initial CHINS petition, the children were not released back to Mother's care and custody. Instead, they remained in relative care leading up to the filing of the second CHINS petition, when their placement in relative care was continued by the trial court.

DCS offered no evidence that parents had provided any positive drug screens. Following the presentation of the evidence, counsel for Mother raised the following argument:

> These kids have been detained since, um, I think the end of June. The end of June the children were removed and the parents requested a contested fact-finding hearing. They didn't get it until September, um, where DCS put on evidence and then was allowed to continue it for another month until the end of October and they said that they were gonna bring more evidence because they hadn't put on enough. Um, they came back and didn't put on any new evidence and the Court dismissed the CHINS petition and DCS immediately refiled and said there was gonna be new evidence that would be presented that had come to light, um, in the time since they have [sic] lost their initial petition. And so parents requested another contested fact-finding and we came here today and are supposed to be hearing that new evidence of, um, what circumstances have changed since we were here in September and DCS failed to prove their case the first time. Um, I [don't] think we've heard any new information. . . .

Tr. Vol. II p. 71-72.

[4] On January 3, 2018, the trial court issued an order finding the children to be CHINS. The CHINS finding is primarily based on the cluttered and unclean state of the home and the condition of the home environment in general; the lack of a consistent and structured educational program for the children; and the erratic behavior of the parents as observed by the children. Mother now appeals.

# Discussion and Decision

## I. Due Process

Mother argues that her due process rights were violated because DCS was allowed to file a second CHINS petition based on substantially similar allegations that were found insufficient the first time.

Parents are, indeed, afforded procedural due process protections in CHINS proceedings. *E.g.*, *In re K.D.*, 962 N.E.2d 1249, 1257 (Ind. 2012). When reviewing a procedural constitutional challenge, we must determine whether the process employed was fair. *Ind. High Sch. Athletic Ass'n, Inc. v. Carberg*, 694 N.E.2d 222, 241 (Ind. 1997). Constitutional claims are waived when raised for the first time on appeal. *E.g.*, *McBride v. Monroe Cty. Office of Family and Children*, 798 N.E.2d 185, 194 (Ind. Ct. App. 2003).

## A. Res Judicata

Mother first argues that principles of res judicata should have barred the trial court from granting DCS's second CHINS petition. It is unclear whether Mother contends that the subsequent petition is barred by claim preclusion or issue preclusion. Claim preclusion applies where a final judgment acts as a complete bar to all subsequent action on the same issue or claim between the parties. *M.G. v. V.P.*, 74 N.E.3d 259, 264 (Ind. Ct. App. 2017). For claim preclusion to apply, four elements must be established: (1) the former judgment was rendered by a court of competent jurisdiction; (2) the former judgment was rendered on the merits; (3) the same issue was, or could have been, determined

in the prior action; and (4) the first action was between the same parties. *Id.* Issue preclusion, on the other hand, bars litigation of the same facts or issues that were adjudicated in a former lawsuit, but applies only to the matters actually litigated and decided rather than to all matters that might have been decided. *Freels v. Koches*, 94 N.E.3d 339, 342 (Ind. Ct. App. 2018).

[8] In June 2017, DCS filed its first CHINS petition, which was based primarily on the parents' alleged drug use. At the September-October 2017 factfinding hearing, DCS failed to prove its case, so the trial court denied and dismissed its petition. The next day, DCS filed another CHINS petition. This petition offered different reasons for the CHINS status, and the second time, the trial court found that DCS had met its burden. But no evidence was offered in the second CHINS factfinding hearing that was not equally available in the first. In June through October 2017, the home was cluttered and unclean, the children's education was inconsistent and unstructured, and the parents' behavior was, at times, erratic. All of this evidence could have been presented at the first factfinding hearing, but for unknown reasons, it was not.

[9] Counsel for Mother, however, voiced these concerns only as an evidentiary argument at the close of the factfinding hearing. At no point did counsel move to dismiss the CHINS petition based on issues of res judicata. As such, we are compelled to find that this issue has been waived.

[10] While we are unable to grant relief to Mother on this argument, in no way do we intend to condone the way in which DCS litigated this case. If DCS had

sufficient concern about these children to file the first CHINS petition, it should have gathered enough evidence to prove its case—the first time.[2] Why it was able to gather this evidence the second time but not the first is not wholly clear, but we explicitly discourage DCS from adopting this process on a regular basis. We share Mother's concern that this process allows DCS "to take multiple bites at the apple by litigating piecemeal until a court of competent jurisdiction finally determine[s] that the facts presented [are] sufficient to carry [DCS's] burden." Reply Br. p. 8. That would, indeed, implicate very serious due process concerns.[3] In this case, however, as Mother did not move to dismiss the petition based on res judicata, the issue is waived for appellate purposes.[4]

## B. New Filing and Removal

[11] Mother also argues that an improper process was employed with respect to the children's detention in relative care. Specifically, she contends that the children

---

[2] We also question why, when DCS and the people involved with this family have explicit and consistent concerns about the parents' drug use, DCS failed to offer any actual evidence of substance abuse at *either* factfinding hearing.

[3] Indiana Code section 31-34-12-5 allows evidence of prior acts or omissions in CHINS proceedings. Therefore, it is undeniable that the evidence offered at the second CHINS proceeding was properly admitted. But we strongly question whether there should have been additional, new evidence supporting the new CHINS petition—evidence that was not available during the first CHINS proceeding—to avoid res judicata problems.

[4] In addition to our concerns about the way in which the CHINS process was litigated, we are troubled by portions of DCS's appellate brief. Mother moved to strike multiple assertions made by DCS in its brief, including several statements of "fact" regarding parents' drug screens. As noted above, DCS did not even attempt to prove parents' substance abuse at the factfinding hearing. Moreover, the trial court actually *excluded* some of the evidence supporting these assertions from the first CHINS proceeding. It is at best, careless, and at worst, dishonest, for DCS to include these "facts" in its brief with no evidentiary support. We grant Mother's motion to strike by separate order and strongly suggest that DCS be more careful in future appellate endeavors.

should have been returned to her care and custody when the first CHINS petition was denied and dismissed on November 7, 2017. Instead, the trial court continued their detention until the next day, when DCS filed a new CHINS petition and sought a new detention hearing.

[12] This situation is an example of why we are so very concerned about the process employed by DCS in this case. Having failed to prove the first CHINS petition, DCS filed a second CHINS petition the next day and left the children in relative care, arguing that it would have traumatized the children to return them home for one day. We do not disagree regarding the trauma to the children, but observe that if DCS had simply put in a better effort during the first CHINS case, this problem would not have arisen at all. That said, we do not find that this procedural irregularity, or the delay of one day, amounts to a sufficient reason to reverse the trial court's order in this case.

## C. Educational Neglect

[13] Finally, Mother argues that she was denied due process because, although the second CHINS petition did not include specific facts alleging educational neglect, the children's education ended up being a primary point litigated during the factfinding hearing and then relied upon by the trial court in its final order. But Mother did not object to any of the evidence admitted at the hearing regarding educational neglect; she also cross-examined DCS's witnesses on the issue. Tr. Vol. II p. 21, 37-39. As such, she impliedly consented to the issue being incorporated into the CHINS proceeding. *See In re V.C.*, 867 N.E.2d 167,

168 (Ind. Ct. App. 2007) (holding that issues not set out in the pleadings may be tried by the express or implied consent of the parties, including situations in which the evidence at trial is such that a reasonably competent attorney would have recognized that the un-pleaded issue was being litigated). Under these circumstances, we decline to find a due process violation.

## II. Sufficiency

[14] Mother also argues that the evidence is insufficient to support the trial court's order finding the children to be CHINS. Our Supreme Court has explained the nature of a CHINS proceeding and appellate review of a CHINS finding as follows:

> A CHINS proceeding is a civil action; thus, "the State must prove by a preponderance of the evidence that a child is a CHINS as defined by the juvenile code." *In re N.E.,* 919 N.E.2d 102, 105 (Ind. 2010). We neither reweigh the evidence nor judge the credibility of the witnesses. *Egly v. Blackford County Dep't of Pub. Welfare,* 592 N.E.2d 1232, 1235 (Ind. 1992). We consider only the evidence that supports the trial court's decision and reasonable inferences drawn therefrom. *Id.* We reverse only upon a showing that the decision of the trial court was clearly erroneous. *Id.*

> There are three elements DCS must prove for a juvenile court to adjudicate a child a CHINS. DCS must first prove the child is under the age of eighteen; DCS must prove one of eleven different statutory circumstances exist that would make the child a CHINS; and finally, in all cases, DCS must prove the child needs care, treatment, or rehabilitation that he or she is not receiving and that he or she is unlikely to be provided or accepted

without the coercive intervention of the court. *In re N.E.,* 919
N.E.2d at 105.

*K.D.,* 962 N.E.2d at 1253-54 (footnote omitted).

Here, DCS alleged that the children were CHINS pursuant to Indiana Code
section 31-34-1-1, which provides as follows:

> A child is a child in need of services if before the child becomes
> eighteen (18) years of age:
>
> (1) the child's physical or mental condition is seriously
> impaired or seriously endangered as a result of the
> inability, refusal, or neglect of the child's parent, guardian,
> or custodian to supply the child with necessary food,
> clothing, shelter, medical care, education, or supervision;
> and
>
> (2) the child needs care, treatment, or rehabilitation that:
>
> (A) the child is not receiving; and
>
> (B) is unlikely to be provided or accepted without the
> coercive intervention of the court.

Our Supreme Court has interpreted this provision to require "three basic
elements: that the parent's actions or inactions have seriously endangered the
child, that the child's needs are unmet, and (perhaps most critically) that those
needs are unlikely to be met without State coercion." *In re S.D.,* 2 N.E.3d 1283,
1287 (Ind. 2014).

[16]     The primary reasons that the trial court found the children to be CHINS were their insufficient education and the condition of the home and home environment. Its findings on these issues are as follows:

> 22.     The evidence shows that [E] and [M] have not attended any school for the past 5 years. [S] is 9 and has never attended school. The testimony of Paternal Grandmother is credible that she began to provide some education for the children when she noticed their deficits, including inability to read. The testimony of [M] and [E] is credible that the parents gave them "random stuff," but they didn't really have education in the home and [E] wanted to go to school but was not able to. Although some of these children are doing better than others academically, they all suffer from educational delays and need to catch up if possible. There is no evidence that either parent provided a program of instruction to any of the children that was comparable to the public school system or any evidence of any regular and consistent course of study needed for health and normal education. Deprivation of education for up to five years for some children constitutes negligence that seriously endangers their mental condition.

> 23.     The condition of the housing and home environment also constitutes neglect and a serious endangerment to the children. The testimony of Maternal Grandmother, Paternal Grandmother and the oldest children is credible that the parent's home is packed with boxes, clothes, books, furniture, and stuff that some of the bedrooms cannot be entered and the children don't have access to their beds. Paternal Grandmother unearthed rat feces when she cleaned one of the rooms. Grandparents acknowledge the danger to the children from this housing with particular concern for the baby. Additionally, the environment of the home contributes to this finding of neglect. Allowing strangers to wander through the home at the expense of the privacy of the children prioritizing the needs of strangers over the children

endangers the well-being of the children. Parent behaviors that their teenage children describe as "weird," "crazy," and "frightening" and that the children believe may be the result of the parents' drug use, including grunting, flipping tables, yelling, throwing things, and "destroying" the home, is seriously endangering to the mental condition of the children. Although the evidence did not show undernourishment, the "hunger" expressed by at least one of the children is a significant concern. The testimony of the older children of occasional hunger and their stated desire for 3 meals a day, might not support a finding of CHINS standing alone, but it is a factor of negligence when combined with the other evidence.

Appellant's App. Vol. II p. 60-63. These factual findings all find support in the evidence presented at the factfinding hearing. Mother points out that paternal grandmother is not an education expert and asks us to discount her testimony as a result, but this amounts to a request that we reweigh evidence and re-assess witness credibility, which we may not do.

[17] With respect to educational neglect, the record reveals that the parents do not trust the public school system. They have occasionally enrolled some of the children in school, but when the school recommended that the children receive various types of special assistance, the parents removed the children from school. The parents claimed to be homeschooling the children, but the record reveals that they did not do so in any consistent or structured manner. The nine-year-old did not know the alphabet or how to write his name. The two children who testified at the factfinding hearing had not been to school for five years and were far behind their grade level. Part of the reason Eq.W. did not want to return to his parents' home is because he was worried they would

remove him from school again. We find that this evidence supports the trial court's conclusion that the parents failed to provide their children with a suitable education, endangering the children's mental condition as a result.

[18] Mother also argues that evidence related to the home and home environment all related to conditions in the past. Initially, we note that the home based case manager reported that in late September or October 2017—in the months leading up to the factfinding hearing—the home was unclean, with clothing filling the rooms such that people could not walk on the floor. Additionally, maternal grandmother testified that as of October, when conditions had improved slightly, the home was still so cluttered that multiple rooms, including two bedrooms and one bathroom, were unusable. Tr. Vol. II p. 51-52. Paternal grandmother and the children who testified also expressed concerns about the dirty state of the home. After October, the parents refused to allow anyone into their home. We find that this evidence supports (1) a conclusion that the parents' home is habitually so unclean and cluttered that it seriously endangered the children; and (2) a reasonable inference that the home was still in such a state at the time of the factfinding hearing.

[19] Mother correctly argues that financial insecurity cannot be the sole factor supporting a CHINS adjudication. But the trial court's findings regarding educational neglect and the condition of the home support the CHINS adjudication, even apart from any concerns about the family's financial situation.

[20] Finally, Mother contends that the evidence does not support a conclusion that the coercive intervention of the court is necessary to ensure the children are provided the care that they need. We disagree. While the parents voluntarily attended substance abuse treatment, they only allowed the home based case manager into their home once and stopped meeting with her once their utilities were turned back on. They refused to allow the FCM into their home. They attended one Child and Family Team Meeting, at which time the father became verbally aggressive, and then failed to attend the next one. Mother became angry when the two grandmothers tried to discuss their concerns about the children. Maternal grandmother found it to be a struggle to get Mother to create and follow a daily schedule to ameliorate some of the underlying issues; Mother would comply for a couple of days and then stop. Under these circumstances, we find that the evidence supports the trial court's conclusion that the coercive intervention of the court was necessary.

[21] In sum, while we disapprove of the way in which DCS litigated this case, we find that the evidence supports the trial court's conclusion that the children are CHINS.

[22] The judgment of the trial court is affirmed.

Kirsch, J., and Bradford, J., concur.